**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-19-001 (RCL)** |
| **GREGORY RICHARD PURDY, JR.** | |
| **Defendant.** | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the Government requests that this Court sentence Gregory Richard Purdy, Jr. ("Purdy" or "Gregory Purdy") to 63 months' imprisonment, a three-year term of supervised release, $2,000 restitution, and mandatory assessments of $100 per felony, $25 per Class A misdemeanor, and $10 per Class B misdemeanor. The Government's custody recommendation for Purdy of 63 months is at the top of Purdy's Guidelines Range (51 to 63 months' imprisonment as calculated by the Government).

## I.    INTRODUCTION

The defendant, Gregory Richard Purdy, Jr., participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States

1

Even before reaching Capitol grounds, Purdy made clear his goal was to stop the certification, recording a statement en route to the Capitol in which he said, "We're not letting this steal happen… We're going to the Capitol right now…"   Purdy then joined a crowd of rioters that charged MPD officers on a sidewalk near the Lower West Terrace of the U.S. Capitol.   There, he shouted "You gotta let us by"; Purdy lowered his shoulder and pushed into MPD Officer A.G., knocking him off the police line; and Purdy pushed MPD Officer B.B..   At the top of the Northwest stairs, Purdy pushed over a barricade towards U.S. Capitol Police Officer B.T., which was part of the last line of defense by the U.S. Capitol Police protecting the Upper West Terrace and the Capitol Building.   Purdy was then part of the first group of rioters to enter the U.S. Capitol Building, entering through the Senate Wing Doors approximately 21 seconds after that door was breached.   And after initially exiting the building through the Senate Carriage Door, Purdy reentered the Capitol Building immediately.   Then, after exiting the Capitol Building the second time, Purdy remained on restricted Capitol grounds for more than an hour.   During that time, Purdy threatened MPD officers on the Upper West Terrace ("Are you guys going to let us in, or are we gonna have to push in?"), and attempted to coordinate other rioters into a big push against those officers (waving other rioters to move forward towards the officers, yelling "Guys, guys, we all gotta go at once…", and counting down from ten to one with his hands raised for the crowd). Purdy then ran into the MPD officers and broke through the police line, specifically by rushing

---

Capitol Building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

MPD Officer C.K. and successfully pushing Officer C.K. back off of the police line, and then grabbing the officer's baton.  After the riot, Purdy posted multiple videos and statements about the January 6 riot and his assaults of officers on his Instagram account, bragging about his exploits at the Capitol and advocating for political violence.

The Government recommends that the Court sentence Purdy to 63 months of incarceration for his convictions of violating 18 U.S.C. §§ 111(a) and 231, and 40 U.S.C. §§ 5104(e)(2)(D) and (G).  A 63-month sentence reflects the gravity of Purdy's conduct, and his lack of remorse for his actions.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The Government refers the court to the Affidavit accompanying the Complaint filed in this case, ECF 1-1 ("Statement of Facts"), pp. 2-3, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.     Gregory Purdy's Role in the January 6, 2021 Attack on the Capitol

#### *Approach to the Capitol*

Gregory Purdy, a 26-year-old consultant with a property management company, participated in the January 6 attack on the Capitol.  Purdy and his brother, Matthew Purdy, traveled from their home in Hopewell Junction, New York, to Washington, D.C., to protest the results of the 2020 federal election.  Their uncle, Robert Turner ("Turner"), joined them.  On January 6, 2021, Purdy, Matthew Purdy, and Turner (collectively, "the Defendants") attended the "Stop the Steal" rally, then joined the crowds that approached the U.S. Capitol on Pennsylvania

Avenue.  En route to the Capitol, Purdy recorded a statement indicating that he was going to the Capitol to help stop the certification of the 2020 presidential election, saying, "We're not letting this steal happen.   We're not letting this atrocity against democracy happen.   Because that's what it is.   We're going to the Capitol right now, we're marching there.   We're not going to leave until we demand the right thing be done today." *See* Image 1.   Gregory Purdy posted that video to his public Instagram account.



*Image 1, Video showing Purdy walking to the U.S. Capitol on January 6, 2021 (source: Trial Ex. 411.1, Video on Gregory Purdy's Instagram account, at video time 00:00)*

### Assault on Officers A.G. and B.B. on Sidewalk Near Lower West Plaza

At 2:01 p.m., the Defendants were part of a group of protestors that stood opposite a group of MPD officers who were dressed in hard gear. The MPD officers had reported to the U.S. Capitol

in response to a city wide "1033," which is a call indicating that officers need assistance.    In this case, U.S. Capitol Police needed assistance to protect the Capitol, members of Congress, and their staff.    The group of MPD officers were on a sidewalk on the West side of the Capitol, moving towards the Lower West Plaza.    The officers had to stop their progress because they were surrounded on all sides by rioters, including the Defendants.    Purdy yelled at the officers, including yelling, "You gotta let us by . . . You don't have to listen to them . . . tell your guys . . ."   *See* Image 2.    Purdy was directly in front of and close to MPD Officer A.G., who was near the back of the group of officers.    Officer A.G. focused on Purdy because the defendant kept coming forward to the officer.    Officer A.G. had his baton in his hands in a defensive posture.



*Image 2, Gregory Purdy (circled in green) facing MPD Officer A.G. on sidewalk near the Lower West Plaza (source: Trial Ex. 503.1, Clip from open-source video Nigrotime 2021, at video time 00:13).*

The crowd charged the officers.    Purdy lowered his shoulder and pushed into MPD Officer

A.G., trying to come under the officer's baton towards his midsection.    The impact from Purdy's push forced Officer A.G. to take one step back, but the officer could not back up further due to other officers that were behind him. *See* Images 3 and 4.   Officer A.G. then tried to push Purdy away from him.



*Image 3, Gregory Purdy (in green box) pushing against Officer A.G's baton at start of physical shove into the officers (source: Trial Ex. 601.3, Clip from Officer A.G.'s body-worn camera, video time 00:59)*



*Image 4 Gregory Purdy (red, white and blue jacket) pushing against Officers A.G. (source: Trial Ex. 602.2, Clip from Officer B.B.'s body-worn camera, video time 00:46 - 00:47)*

MPD Officer B.B. was also on the sidewalk near the Lower West Plaza, directly to the left of Officer A.G.   Purdy also pushed and shoved MPD Officer B.B.   *See* Image 5. Purdy pushed

his way through the entire group of officers and came out on the other side, closer to the Lower West Plaza and accessing the Northwest staircase.



*Image 5, Gregory Purdy (red, white and blue jacket) pushing against Officer B.B. (source: Trial Ex. 602.2, Clip from Officer B.B.'s body-worn camera, video time 00:46 - 00:47)*

Later, Gregory Purdy posted video from his push against officers on Instagram, with the notation: "Peep my war cry at the end as we push through this riot team after they didn't listen to us… [emoji's]"   *See* Image 6.



*Image 6, Video showing police and Purdy's coat (lower left of frame) on sidewalk near Lower West Plaza (source: Trial Ex. 416, Video on Gregory Purdy's Instagram account, at video time 00:01)*

### *Pushing Over Barricade on Northwest Staircase*

After Purdy pushed through the group of officers near the Lower West Plaza, he approached a set of stairs on the Northwest side of the Capitol.   From the base of the stairs, Purdy motioned to Turner and Matthew Purdy to come to the stairs.   On the stairs, there was scaffolding set up for the ongoing construction of the stage to be used at the then-upcoming inaugural ceremonies. The crowd overran the barriers that had been set up to prevent the public from entering the west side of the Capitol, the scaffolding, and the Upper West Terrace of the Capitol. U.S. Capitol Police officers tried to prevent rioters from entering the scaffolding and moving up the stairs to the Upper West Terrace.

Purdy passed rioters, climbed onto the staircase banister, and part of the way up the Northwest staircase.   On the staircase, Purdy was filmed saying, "Right now we're on top of the Capitol, everybody's stormed through.   We're the second wave coming in." *See* Image 7.   Purdy

admitted that there was tear gas and pepper spray being deployed against the rioters, and stated "[w]e're not gonna let them do this to us.".   Later, Purdy posted that video to Instagram.



*Image 7, Video of Purdy on Northwest stairs (source: Trial Ex. 417.1, video time 00:03)*

U.S. Capitol Police officers held a line near the middle of the Northwest staircase and scaffolding, but at 2:09 p.m. rioters, who were advancing up the stairs towards the Capitol Building, pushed the line of officers back to the top of the staircase. The Defendants climbed through the scaffolding and up to the top of the staircase at approximately 2:10 p.m. to 2:11 p.m.

After rioters forced officers to retreat to the top of the Northwest staircase, U.S. Capitol Police officers tried to reestablish the police line at the top of the stairs.   The officers set up a line of barricades and stood behind the barricades.   This line was the final physical barrier between the rioters and the Upper West Terrace and the Capitol Building.   Officers told the large group of rioters to "Stop." Also, officers, including U.S. Capitol Police Officer B.T., initially held onto the barricades against the rioters, while the rioters pushed on the barricades attempting to move past the officers.   See Trial Ex. 506.2, video time 01:36 – 02:12.   Rioters can be seen overwhelming

the outnumbered police and pushing the barricades to the ground, successfully breaking through

metal barricades.   Purdy lunged forward towards Officer B.T., grabbed one of the barricades with

both hands and pushed this barricade over towards Officer B.T. and to the ground. *See* Image 8.

A second barricade that was attached to the first barricade also topped over.



*Image 8, Purdy (circled in green) pushing over a barricade on the Upper West Terrace towards
officer B.T. with co-defendants Matthew Purdy (circled in yellow) and Turner (circled in red)
(source: Trial Ex. 506.2, at video time 02:03.   Open-source video)*

When the barricades were on the ground, it was harder for the officers to hold the line.

The officers were overwhelmed and retreated.   Without that defense from the line of officers and

barricades, the rioters had nothing between them and the Capitol Building.   Purdy crossed over

the barricades on to the Upper West Terrace, as Matthew Purdy and Turner were filming the chaos

on their cell phones.   After the riot, Purdy posted one video on Instagram that showed himself as

he stepped over the barricades and moved towards the U.S. Capitol Building, with a comment that

read, in part: "This was just after we pushed the top level gates over. The cops were swinging their

batons trying to keep us back. . . instead of fighting us super hard like the last ones [ ] we easily

pushed through them and they all ran !!!" *See* Image 9.



*Image 9, Video of Purdy as he pushed past barricades to enter the Upper West Terrace (source: Trial Ex. 422, video time 00:06)*

### Entering the U.S. Capitol Building

Purdy ran across the Upper West Terrace and towards the Senate Wing Doors of the U.S. Capitol Building.   At approximately 2:13:03 p.m., rioters from the outside of the Capitol broke the windows to the Senate Wing Doors of the U.S. Capitol Building and climbed through one of the broken windows. At 2:13:30 p.m., protesters kicked open the Senate Wing Door from the inside. As this was an emergency door, an alarm was set off when the Senate Wing Door was breached. Rioters began to enter through the emergency door. Protestors broke open the second

window and climbed inside through the second broken window.   At 2:13:51 p.m., approximately

21 seconds after the initial breach of the Senate Wing doors, Purdy, along with Matthew Purdy

and Turner, entered through the broken door.   *See* Image 10.   Open source video at this time

captures the sounds of the mob breaking windows and yelling, and the alarms sounding when the

door is breached. *See* Image 11.



*Image 10, Purdy (circled in green), Matthew Purdy (circled in yellow), and Turner (circled in red) entering the U.S. Capitol through Senate Wing Doors at 2:13:51 p.m. (source: Trial Exhibit 303.9 at video time 01:11. U.S. Capitol surveillance video, Senate Wing Doors)*



*Image 11, Open-source video of Purdy (circled in green), Matthew Purdy (circled in yellow), and Turner (circled in red) and the video inside Senate Wing Doors at 2:13 p.m. (source: Trial Exhibit 303.10 at video time 01:10. Open-source video, @BGOnTheScene)*

At about this time, because of the riot at the Capitol Building, the United States Senate was forced to stop their deliberations on the certification of the election results and to go into recess. Then Vice President Mike Pence had to be evacuated from the Senate floor. The House of Representatives also recessed and stopped its deliberations. Congress did not reconvene until after 8:00 p.m. that evening.

Purdy walked down Senate hallways on the first floor of the U.S. Capitol Building. Later, he posted a video recorded inside the Capitol Building, with the added narrative "Inside the capital getting tear gassed!. . ." *See* Image 12. The video contains images of the rioters passing through the hallways and a white gas spreading amongst rioters. The video captures the sound of the rioters yelling as they pushed deeper into the Capitol Building.



*Image 12, Video posted to Purdy's Instagram showing rioters inside the U.S. Capitol (source: Trial Exhibit 424 at video time 00:10)*

At approximately 2:15 p.m., Purdy ran past an officer and exited the Capitol Building through the Senate Carriage Door, an exit leading to the plaza on the East side of the Capitol. Seconds later, Purdy re-entered the Capitol Building through that door and ran back past the officers and rejoined Matthew Purdy and Turner down the hallway. At approximately 2:16 p.m., the Defendants exited the Capitol Building through the Senate Carriage Door.   Purdy was inside the U.S. Capitol Building for approximately 4 minutes.

### *Assault on MPD Officer C.K. on Upper West Terrace*

Purdy and Turner remained in the restricted area around the U.S. Capitol for more than an hour.   At approximately 3:24 p.m., Purdy and Turner stood directly opposite of a line of MPD officers and in front of a large group of rioters on the West side of the U.S. Capitol, along the

Upper West Terrace. The MPD officers prevented the rioters from re-entering the Upper West Terrace.

At 3:26 p.m., Purdy said to MPD Officer C.K., "I'd have a lot of respect for you guys if you guys stood down."   At 3:27 p.m., a rioter next to Purdy said, "I wanna see Pence. Where's Mike Pence?" and Purdy turned to the rioter and nodded in agreement.   A few seconds later, Purdy said to the officers, "Are you guys going to let us in, or are we gonna have to push in?"   At 3:28 p.m. and other times, Purdy turned back to the crowd of rioters and waved other rioters to move forward towards the officers. At 3:29 p.m., Purdy told the crowd, "Hold your ground, guys, we got more people coming. . ."

At approximately 3:30 p.m., Purdy leaned down and talked with Turner.   Thirty seconds later, Purdy yelled to the crowd, "Guys, guys, we all gotta go at once…" With raised hands, Purdy then counted down from ten to one.   *See* Image 13, *see also* Trial Ex. 603.9, Officer C.K. body-worn camera footage, at video time 03:25 – 03:38; Trial Ex. 606:12, Officer A.S. body-worn camera footage, at video time 01:29 – 01:42.



*Image 13, Purdy (circled in green) counting down from 10 to the crowd on Upper West Terrace with Turner (circled in red) (source: Trial Ex. 511.2, at video time 00:01, open-source video)*

When he reached two on the countdown, Purdy turned, lowered his shoulder, raised his

arms, and ran forward into MPD Officer C.K.   *See* Images 14, 15; *see also* Trial Ex. 603.9 at

video time 03:35 – 03:39.   Officer C.K. was pushed back off the police line by Purdy's forceful

shove.





*Images 14 and 15, Purdy running forward to shove MPD Officer C.K. (source: Trial Ex. 603.9,*
*Clip from Officer C.K.'s body-worn camera, video time 03:35 – 03:37)*

Purdy forced his way past Officer C.K. and got through the police line.  *See* Trial Ex. 603.9 at video time 03:40 – 03:40.  Purdy then ran onto the Upper West Terrace, but he ran back towards the officers.  *See* Trial Ex. 603.9 at video time 03:41 – 03:46.  Officer C.K. attempted to stop Purdy, who then grabbed the officer's baton.  *See* Trial Ex. 603.9 at video time 03:47.  Other officers assisted and were able to restrain Purdy.  *See* Trial Ex. 603.9 at video time 03:47 – 04:00.

### Defendant's Social Media posts

After the riot, Purdy posted multiple videos and added narratives to his Instagram account about the Defendants' actions on January 6, 2021.  A number of those videos are incorporated in the facts above.  In addition, Purdy and Turner made a number of video clips after leaving the Capitol, from the back of a vehicle.  These video clips included Purdy saying the following:

- "We didn't care if we had to sleep there in order for these Congressmen to make the right decision."  *See* Trial Ex. 431.1.

- "Like, if your government does not follow the law and undermines democracy, which you don't have a government, you don't have that. . . Wouldn't force be kind of necessary? Not, not saying that we did that, I mean we did peaceful pushing…" *See* Trial Ex. 427.1.

- ". . . limited level of force, but given those circumstances, it's our job to uphold the Constitution and do a fucking rebellion. . . Like revolutions happen when fucking government officials don't follow the law." *See* Trial Ex. 428.1.

- "do a peaceful push, right? . .We're getting everybody pumped up. Six, five, four, three, two…"  *See* Trial Ex. 426.1

- "[N]o, we had enough people, they just weren't scrunched up enough…" See Trial Ex. 429.1

- "[W]e did, we had a lot of people and then they pushed you guys back…"  See Trial Ex. 430.1

Purdy also posted the following to his Instagram account about the January 6 attack on the

Capitol, admitting that he pushed officers but falsely characterizing the pushes as "peaceful.' *See* Image 16.



Today my group and I were key players in conducting peaceful pushes. The game plan was to talk the officers and tell the to STOP FOLLOWING ORDERS AND UPHOLD THE CONSTITUTION. "Officer you need to uphold your oath and defend the constitution!!" When they didn't listen we pushed through (without hitting them of course) we did these peaceful pushes all the way into the capital building. Later in the day (after these next videos as these were shot during the beginning of the pushes) was when I lead another peaceful push except I went to far ahead of my group and then I got swarmed by 10 cops and got my ass kicked!!!

*Image 16, Post from Purdy's Instagram account (source: legal process by FBI).*

The day after the riot, Purdy exchanged private direct messages with other individuals about the events of January 6, including:

-   Today was a mostly peaceful event.  But you know what?  If our democracy is still not respected after today we might need to go 1776 on their ass because that's our duty. Trial Ex. 440.1, January 7, 2021 at 7:45 p.m. EST.

- Another individual sent a message about how Congress had certified the election that morning, Purdy responded, "How is that embarrassing for me?  It's embarrassing for our country and everyone who didn't call out the election fraud and try to do something. . ."  Trial Ex. 442.1, sent January 7, 2021 at 9:55 a.m. (EST).

Gregory Purdy has not shown remorse for his actions on January 6.  Since his trial, Gregory Purdy made statements from the D.C. Jail that demonstrated his lack of remorse for his actions.[2]

Although Officers A.G. and C.K., the assault victims in this case that testified at trial, reported that they did not suffer any physical injuries, the evidence at trial was clear that defendant Purdy had pushed and shoved Officers A.G., B.B. and C.K.   Purdy pushed the officers from their positions, and in the case of Officer C.K., the defendant pushed him off of the police line, which meant other officers had to step up and cover the line.   Further, Purdy's participation in this riot aided those rioters who did succeed in injuring officers and destroying property.  His violent conduct served to incite and embolden other violent rioters around him.

## III.    THE CHARGES AND JURY VERDICT

On May 1, 2024, a federal grand jury returned a Superseding Indictment charging Gregory Purdy with twelve counts: Obstructing Officers During Civil Disorder in violation of 18 U.SC. § 231(a)(3) (Counts 1 and 3); Assaulting, Resisting, or Impeding Certain Officers in violation of 18 U.S.C. § 111(a)(1) (Counts 2 and 5); Obstructing Officers During Civil Disorder in violation of 18 U.S.C. § 231(a)(3) and 2 (Count 4); Obstruction of an Official Proceeding and Aiding and

---

[2] Gregory Purdy calls from the D.C. Jail, including https://rumble.com/v5nzsbn-4ashli-j6-dc-vigil.html at video time starting at 1:23:39; https://www.youtube.com/watch?v=MmAjbCLiPFg, at video time 1:26:30 - 1:38:22; and https://www.youtube.com/watch?v=Q6cHpJ7M784, at video time 1:54:30 – 1:56:30.

Abetting in violation of 18 U.S.C. § § 1512 and 2 (Count 7); Entering and Remaining in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(1) (Count 8); Disorderly and Disruptive Conduct in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(2) (Count 9); Engaging in Physical Violence in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(4) (Count 10); Disorderly Conduct in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(D) (Count 11); Act of Physical Violence in the Capitol Grounds or Buildings in violation of 40 U.S.C. § 5104(e)(2)(F) (Count 12); and Parading, Demonstrating, or Picketing in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G) (Count 13).   ECF 143.

On June 11, 2024, Purdy was convicted of all twelve offenses (six felony counts and six misdemeanor counts) in the Superseding Indictment following a jury trial.   However, on September 4, 2024, the Government moved to dismiss the count charging Obstruction of an Official Proceeding and Aiding and Abetting in violation of 18 U.S.C. § § 1512 and 2 (Count 7) in light of the *Fischer* decision by the U.S. Supreme Court.   ECF 225.

## IV.    STATUTORY PENALTIES

Gregory Purdy now faces sentencing on eleven offenses of conviction.   He has been found guilty of three counts of Obstructing Officers During Civil Disorder in violation of 18 U.S.C. § 231(a)(3) (Counts 1, 2, and 3); two counts of Assaulting, Resisting, or Impeding Certain Officers in violation of 18 U.S.C. § 111(a)(1) (Counts 2 and 5); and Entering and Remaining in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(1) (Count 8); Disorderly and Disruptive Conduct in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(2) (Count 9); Engaging in Physical Violence in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(4) (Count 10); Disorderly Conduct in a Capitol Building in violation of 40 U.S.C.

§ 5104(e)(2)(D) (Count 11); Act of Physical Violence in the Capitol Grounds or Buildings in violation of 40 U.S.C. § 5104(e)(2)(F) (Count 12); and Parading, Demonstrating, or Picketing in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G) (Count 13).

The Presentence Report issued by the U.S. Probation Office includes the maximum penalties that the defendant faces. On Counts 1, 3, and 4, involving violations of 18 U.S.C. § 231(a)(1), the defendant faces up to 5 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100 on each count. On Counts 2 and 5, involving violations of 18 U.S.C. § 111(a)(1), the defendant faces up to 8 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100 on each count. On Counts 8, 9, and 10, involving violations of 18 U.S.C. § 1752, the defendant faces up to 1 year of imprisonment, a term of supervised release of not more than one year, a fine up to $100,000, restitution, and a mandatory special assessment of $25 on each count. On Counts 11, 12, and 13, involving violations of 40 U.S.C. § 5104, the defendant faces up to 6 months of imprisonment, no term of supervised release, a fine up to $5,000, and a mandatory special assessment of $10 on each count.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

Respectfully, the revised PSR includes multiple errors. First, the revised PSR does not include a Guidelines analysis for each Count—specifically Counts One, Four, Nine, and Ten—to

which the defendant was found guilty by the jury. *See* PSR ¶¶ 58-69, 76-81.[3] Second, although the PSR does include a specific guidelines analysis for Counts 2, 3, 5, and 8, the Government does not agree with the guidelines calculation for Count 3. *See* PSR ¶¶ 70-75.    The Guidelines analysis for all counts is as follows:

       Count One: 18 U.S.C. § 231(a)(3) (MPD Officers B.B. and A.G.)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2(a) and (b) | Victim-related adjustment | +6 |
| | **Total** | **20** |

       Count Two: 18 U.S.C. § 111(a)(1) (MPD Officers B.B. and A.G.)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2(a) and (b) | Official Victim | +6 |
| | **Total** | **20** |

---

[3] Sections 1B.1(a)(1)-(3) describe the steps a sentencing court must follow to determine the Guidelines range, which include determining the applicable Guideline, determining the base offense level, applying appropriate special offense characteristics, and applying any applicable Chapter 3 adjustments. Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count." Only after the Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) is performed, is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3. The revised PSR does not follow these steps. It concludes (*see* PSR ¶¶ 54-57) that certain counts group—a conclusion with which the government agrees—but does not set forth the Guidelines calculation separated for each count as required under U.S.S.G. § 1B1.1(a)(4).

Count Three: 18 U.S.C. § 231(a)(3) (U.S. Capitol Police Officers at the Top of the Staircase Leading to the Upper West Terrace between 2:10 p.m. and 2:11 p.m.)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2(a) and (b) | Official Victim | +6 |
| | **Total** | **20** |

Count Four: 18 U.S.C. § 231(a)(3) and 2 (Gregory Purdy and Turner) (MPD Officer C.K. and A.S. on the Upper West Terrace between 3:30 p.m. and 3:32 p.m.)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2(a) and (b) | Victim-related adjustment | +6 |
| | **Total** | **20** |

Count Five: 18 U.S.C. § 111(a)(1) (MPD Officer C.K.)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2(a) and (b) | Official Victim | +6 |
| | **Total** | **20** |

Count Eight: 18 U.S.C. § 1752(a)(1)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| | **Total** | **14** |

Count Nine: 18 U.S.C. § 1752(a)(2)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| | **Total** | **14** |

Count Ten: 18 U.S.C. § 1752(a)(4) (Gregory Purdy and Turner) (MPD Officer C.K. and A.S. on the Upper West Terrace between 3:30 p.m. and 3:32 p.m.)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2(a) and (b) | Official Victim | +6 |
| | **Total** | **20** |

The PSR correctly states that the U.S. Sentencing Guidelines do not apply to Counts 11, 12, and 13. *See* PSR ¶¶ 53.

**Multiple Count Adjustment**

The PSR includes a correct grouping of related offenses. *See* PSR §§ 54-57. Specifically, there should be four groups:

- *Group 1 (Offense Level ("OL") 20)*: Count 1 (OL 20) and Count 2 (OL 20)[4]
  - Count 1 and 2 group pursuant to U.S.S.G. § 3D1.2(b) because they have the same victims, MPD Officers B.B. and A.G.
- *Group 2 (OL 20)*: Count 3 (OL 20)
  - Count 3 does not group with any other count because the victims of the attacks on U.S. Capitol Police Officers at the top of the staircase leading to the Upper West Terrace between 2:10 p.m. and 2:11 p.m., including Officer B.T.
- *Group 3 (OL 20)*: Count 4 (OL 20), Count 5 (OL 20), and Count 10 (OL 20)
  - Counts 4, 5, and 10 also group. Each count is dependent on Purdy's assault of assault of MPD Officer C.K., and thus, with regard to defendant Purdy, have the same victim and should group pursuant to U.S.S.G. § 3D1.2(b).
- *Group 4 (OL 14)*: Count 8 (OL 14) and Count 9 (OL 14)
  - Counts 8 and 9 group pursuant to U.S.S.G. § 3D1.2(b) because they have the same victim – Congress.

The Government agrees with the Probation Office on offense levels for Groups 1, 2, 3, and

4. The Multiple Count Adjustment would be as follows:

| Group/Count | Adjusted Offense Level | Units |
|---|---|---|
| Count Group 1 | 20 | 1.0 |
| Count Group 2 | 20 | 1.0 |
| *(Note: Probation has Group 2 with adjusted Offense Level 20, resulting in 1 additional Unit)* | | |
| Count Group 3 | 20 | 1.0 |
| Count Group 4 | 14 | 0.5 |
| **Total Number of Units** | | **3.5** |

---

[4] Pursuant to Section 3D1.3, "the offense level applicable to a Group is the offense level, determined in accordance with Chapter Two and Parts A, B, and C of Chapter Three, for the most serious of the counts comprising the Group, i.e., the highest offense level of the counts in the Group." U.S.S.G. § 3D1.3(a).

Therefore, the total number of Units for the Multiple Count Adjustment would be 3.5.   Per U.S.S.G. § 3D1.4, where there is 3.5 number of units, there would an increase in Offense Level of adding 4 levels: 20 OL + 4 OLs = Combined offense level of 24.

| | |
|---|---|
| **Combined Offense Level** | **24** |
| Acceptance of responsibility (U.S.S.G. § 3E1.1) | <u>0</u> |
| **Total Adjusted Offense Level:** | **24** |

### *Section 4C1.1 Does Not Apply Because Purdy Used Violence and the Credible Threats of Violence in Connection with His Crimes*

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria.   Despite Purdy's lack of criminal history points, Section 4C1.1 does not apply in this case because of Purdy's personal use of violence or credible threats of violence against people or property under a totality of the circumstances.

In the current case, it is clear that Purdy's actions on January 6 committed acts of violence and he made credible threats of violence against the MPD and U.S. Capitol Police officers.   Purdy was convicted of multiple violent crimes against police on January 6, including 18 U.S.C. §§ 111(a)(1), 231(a)(3), and 1752(a)(4), and 40 U.S.C. § 5104(e)(2)(F).   Purdy used violence and credible threats of violence in connection with the offense.   Purdy pushed through a group of MPD officers on the sidewalk near the Lower West Terrace.   Purdy pushed over a barricade on the top of the Northwest stairs, overwhelming the U.S. Capitol Police that were using the barricade as a last line of defense to the Upper West Terrace.   Purdy encouraged other rioters to charge the MPD officers on the Upper West Terrace, by doing a countdown to the crowd.   Purdy then

lowered his shoulder, rushed into the line of MPD officers and breached the police line.   The crowd of rioters erupted against the police immediately after Purdy's push.   Therefore, Purdy does not meet the requirements of § 4C1.1, specifically subsection (a)(3), and Purdy is not eligible for the decrease his offense level under § 4C1.1.[5]

Finally, to avoid unnecessary litigation, if the court declines to apply § 4C1.1, the Government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.[6]

### U.S.S.G. §2A2.2(a) Aggravated Assault Applies to Purdy's Convictions in Groups 1, 2, and 3

The Government submits that U.S.S.G. §2A2.2 is the correct guideline for calculating the Purdy's offense level for the counts included in Groups, 1, 2 and 3.

Purdy was found guilty by a jury charging him with in Counts Two and Five with violating 18 U.S.C. § 111(a)(1) for assaulting, resisting, or impeding certain officers or employees, and in Counts One, Three and Four with violating 18 U.S.C. § 231(a)(3) with obstructing officers during

---

[5] Judge McFadden recently issued an order directly addressing the amended Guideline Section 4C1.1 in a January 6 case.   In *United States v. Bauer*, Judge McFadden defined "violence" as "[t]he use of physical force," typically "accompanied by fury, vehemence, or outrage" and "unlawfully exercised with the intent to harm".   He also defined it as "the exertion of any physical force so as to injure or abuse." *United States v. Bauer*, No. 21-cr-386-2 (TNM), ECF No. 195 at 4-5; *see also United States v. Hernandez*, No. 21-cr-445 (CKK), ECF No. 65 at 5 (adopting Judge McFadden's definition of violence from *Bauer*).   Further, the credible threat of force was defined by Judge McFadden as "a believable expression of an intention to use physical force to inflict harm." *United States v. Bauer*, No. 21-cr-386-2 (TNM), ECF No. 195 at 6.   Purdy's various violent actions – including multiple direct assaults against officers – meet those definitions, as detailed above.

[6] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under §4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. The government submits that for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

civil disorder.   Because these offenses qualify as an "Aggravated Assault" under U.S.S.G. §2A2.4(c), the appropriate guideline is §2A2.2, rather than §2A2.4. Section 2A2.4(c) is a cross-reference to §2A2.2, which applies "[i]f the conduct constituted aggravated assault."   In that phrase, "conduct" refers to all relevant conduct for the offense, not simply the assault for which Purdy was convicted.  *See United States v. Valdez-Torres*, 108 F.3d 385, 387–88 (D.C. Cir. 1997). Section 2A2.2, in turn, defines "aggravated assault" as a "felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon; (B) serious bodily injury; (C) strangling, suffocating, or attempting to strangle or suffocate; or (D) an intent to commit another felony."   U.S.S.G. §2A2.2 cmt. n.1.

The cross-reference in §2A2.4(c) applies here because the crimes charged in Counts One, Two, Three, Four and Five constitute aggravated assaults.   The Guidelines do not define "assault" or "felonious assault," and sentencing courts have looked to the common law to define "assault" for Guidelines purposes.  *See United States v. Hampton*, 628 F.3d 654, 660 (4th Cir. 2010). Assault encompasses conduct intended to injure another or presenting a realistic threat of violence to another.  *See United States v. Dat Quoc Do*, 994 F.3d 1096, 1099 (9th Cir. 2021) (federal common-law assault includes (1) "a willful attempt to inflict injury upon the person of another," or (2) "a threat to inflict injury upon the person of another which, when coupled with an apparent present ability, causes a reasonable apprehension of immediate bodily harm.") (citations omitted); *Lucas v. United States*, 443 F. Supp. 539, 543-44 (D.D.C. 1977) (individual assaulted police officer, in violation of 18 U.S.C. § 111, where he "forcibly grabbed" the officer; § 111 "includes the lifting of a menacing hand toward the officer, or shoving him"), aff'd, 590 F.2d 356 (D.C. Cir. 1979).

Here, Purdy committed a *series* of assaults that day: by the Lower West Plaza, Purdy lowered his shoulder and pushed into MPD Officer A.G., knocking him off the police line; there he also pushed MPD Officer B.B.; Purdy then went to the top of the Northwest stairs and grabbed a barricade in front of a line of officers and threw the barricade over towards U.S. Capitol Police Officer B.T., interfering with officers' ability to hold the line; then, after leaving the Capitol Building the second time, Purdy threatened officers on the Upper West Terrace, ; he then attempted to coordinate other rioters into a big push against those officers (waving other rioters to move forward towards the officers, yelling "Guys, guys, we all gotta go at once…", and counting down from ten to one with his hands raised for the crowd); and finally, Purdy ran up stairs and rammed into MPD Officer C.K. and successfully pushed him back off of the police line, and then grabbed the officer's baton, only stopping when other officers physically restrained him.   Purdy engaged in multiple attacks against officers in different locations and at different times. All three of these incidents fit squarely within the common law understanding of what constitutes an assault, rather than simply interfering, resisting, or offensively touching another person. Instead, he engaged in affirmative conduct that comfortably can be viewed as an assault.

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 91. Accordingly, based on the Government's calculation of the defendant's total adjusted offense level at 23, Purdy's Guidelines imprisonment range is 51 to 63 months' imprisonment.

### *Other Guidelines considerations*

After determining the defendant's Guidelines range, a court then considers any departures or variances. *See* U.S.S.G. § 1B1.1(a)-(c).   Because the defendant's Guidelines range does not

capture the unprecedented and uniquely harmful nature of his crimes, which struck at the heart of our democracy and the rule of law, the government must contextualize the crime. Moreover, the following information and argument make it clear that – while the government is not advocating for such variance or departure – the high end of the guidelines is not only reasonable, but fully balances the defendant's conduct and the circumstances in which he committed said conduct. One cannot divorce the gravity of the overall threat to democracy from the defendant's assaultive behavior.

Indeed, as it stands now, nothing in this defendant's guidelines calculation reflects the fact that the defendant was responsible for substantial interference with Congress's work to peacefully transfer power from one administration to the next. There are no specific offense characteristics here for attacking democracy or abandoning the rule of law. There are also no enhancements for harming law enforcement during the transfer of power in the American executive branch. Thus, a sentence at the high end of the defendant's range properly ""reflect[s] the seriousness of the offense," "promote[s] respect for the law," and "provide[s] just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).

It is not hyperbole to call what happened on January 6 a crime of historic magnitude. As judges of this district have repeatedly and clearly stated, January 6 was an unprecedented disruption of the nation's most sacred function—conducing the peaceful transfer of power. "The events that occurred at the Capitol on January 6th will be in the history books that our children read, our children's children read and their children's children read. It's part of the history of this nation, and it's a stain on the history of this nation." *United States v. Miller*, 21-CR-75-RDM, Sent. Tr., at 67. But just as the history books will describe the crimes of January 6, so will they tell the

story of how this nation responded.    Future generations will rightly ask what this generation did to prevent another such attack from occurring.    The damage done to this country on January 6 must be reflected in the sentences imposed on those who caused the damage—it must not be treated as just another crime.

Even before *Fischer*, judges of this Court gave significant upward departures and/or variances in January 6 cases when they found the advisory guideline range inadequate. *See, e.g., United States v. Hale-Cusanelli,* 21-CR-37-TNM, 9/22/22 Sent. Tr.; *United States v. Christian Secor*, 21-CR-157-TNM, 10/19/22 Sent. Tr.; *United States v. Hunter and Kevin Seefried*, 21-CR-287-TNM. 10/24/22 Sent. Tr.; *United States v. William Watson*, 21-CR-513-RBW, 3/9/23 Sent. Tr.; *United States v. Riley Williams*, 21-CR-618-ABJ, 3/23/23 Sent. Tr.; *United States v. Hatchet Speed*, 22-CR-244-TNM, 5/8/23 Sent. Tr.

Since *Fischer*, judges have similarly sentenced defendants to account for the disparity between the guidelines and the actual context.    For example, in *United States v. Sparks*, 21-cr-87-TJK, Judge Kelly sentenced a defendant with an advisory guidelines range of 15-21 months to 53 months' imprisonment.    *See* Sentencing Ex. A, *United States v. Sparks*, 21-cr-87-TJK, Sentencing Transcript, p. 101.    In doing so, the Court applied U.S.S.G. §§ 5K2.7 and 5K2.21, and noted that the jury had found that the defendant had the corrupt intent to interfere with Congress.    Because Sparks' advisory guideline range was driven by the § 231 conviction, that range did not "account for the defendant's intent to obstruct, not just law enforcement officers doing their duty under that statute, but a proceeding, or for the purposes of [U.S.S.G. §] 5K2.7, a governmental function." *Id*. at pp. 94-95.    And not any proceeding, but one foundational to our country's governance." *Id*. at p. 93.    Judge Kelly found it important that despite the dismissal of the § 1512(c)(2) count, the

defendant's conduct still included "an intent to obstruct or interfere with that proceeding, that important constitutional proceeding" which the court found to be "pretty dark behavior" which "posed a threat to whether our constitutional process will proceed or whether a mob would interfere with that process." *Id*. at pp. 87-88. The court found Sparks' intent to "interfere or obstruct with the electoral college vote certification . . . plays an important role in explaining why" Sparks' advisory guideline range did not fully account for his criminal conduct. *Id*. at p. 94.

Other judges have recognized this disparity too. *See United States v. Robertson*, 21-cr-34-CRC (imposing an upward departure because the conduct resulted in a significant disruption of government); *United States v. Dunfee*, 23-cr-36-RBW (imposing an upward departure because the guidelines no longer adequately captured the defendant's intent to stop the peaceful transfer of power). While the Supreme Court's decision in Fischer has changed defendant's advisory Guideline range, "*Fischer* does not dictate the Court's application of the 18 U.S.C. 3553(a) factors [because] the Court may still consider [defendant's] serious conduct on January 6th, 2021 in its entirety. To reduce [defendant's] sentence . . . would require this Court to take a drastically different view of [defendant's] conduct." *United States v. Hostetter*, 21-CR-392-RCL, ECF 507, at 4-5 (cleaned up). Indeed, "*Fischer* does not mean that I cannot consider at sentencing evidence that establishes that the defendant intended to obstruct Congress' certification of the electoral vote in determining whether . . . the resulting guideline range fully accounts for the criminal conduct." *Sparks* Sentencing Tr. at 95. *See also United States v. Kelly*, 21-CR-708-RCL, ECF 151, at 5 ("Nothing about *Fischer* or any hypothetical outcome of [defendant's] appeal bears directly on the severity of his conduct on January 6th . . . . Likewise, the outcome in *Fischer* would not dictate the Court's application of the sentencing factors prescribed in 18 U.S.C. § 3553(a)"); *United States*

*v. Jensen*, 21-CR-6-TJK, Sent. Tr. at 16 ("given the importance and the significance of the proceeding of certifying the Electoral College votes, I would vary upward -- even if this [sentencing enhancement] didn't apply, I would vary upward when considering the nature of the offense.").

In a recent sentencing, this Court made clear its view on the January 6 attack:

There can be no room in our country for this sort of political violence. The Framers designed our constitutional system so that the people govern through their representatives, according to law. Decisions are the result of elections, debates, and compromise. The people, through their representatives, decide. By contrast, those who think political ends justify violent means seek to replace persuasion with intimidation, the rule of law with "might makes right." Violence risks begetting a vicious cycle that could threaten cherished conventions and imperil our very institutions of government. In that sense, political violence rots republics. Therefore, January 6 must not become a precedent for further violence against political opponents or governmental institutions. This is not normal. This cannot become normal. We as a community, we as a society, we as a country cannot condone the normalization of the January 6 Capitol riot.

*United States v. Johnatakis*, 1:21-CR-91 (RCL) (Sentencing hearing, April 3, 2024).   Those were not merely empty words—they were a recognition of the seriousness and unprecedented nature of the riot.

To be clear, the fact that the government is not seeking a variance or departure above 63 months, the top of the applicable guidelines range, does not diminish the gravity of our request and the need to appropriately account for the conduct and the crime.

In this case, the Government submits that a total sentence of 63 month's imprisonment is warranted to reach an appropriate sentence. As discussed below, similarly situated defendants have received sentences of around 60-88 months. Purdy was out in front on multiple occasions – pushing down a barricade to reach the U.S. Capitol Building, being one of the first rioters to enter the Capitol through a broken door, encouraging other rioters to move against a line of officers

protecting the Upper West Terrace, and breaching that line of officers by pushing into the officers. Purdy is without remorse for his actions.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Purdy's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis.    Even before arriving at the Capitol, Purdy indicated that he was going to the Capitol specifically to stop the certification ("We're not letting this steal happen. We're not letting this atrocity against democracy happen… We're going to the Capitol right now…").    While at the Capitol, Purdy pushed Officers A.G. and B.B., who were part of a group of officers near the Lower West Plaza.    Purdy then pushed over a barricade that was part of the last line of defense of U.S. Capitol Police protecting the Upper West Terrace and the Capitol Building.    He was one of the first rioters that entered the U.S. Capitol (entering through the Senate Wing Doors only 21 seconds after breach), entered the building twice, and  after exiting the Capitol Building the second time, Purdy remained on restricted Capitol grounds for more than an hour.    While remaining on restricted Capitol grounds after exiting the building, Purdy encouraged other rioters to charge a police line on the Upper West Terrace, and he led the way when he rushed into MPD Officer C.K. and broke through the police line.    Finally, Purdy posted multiple videos of the assaults and other acts on his Instagram accounts, with statements celebrating his actions

and justifying the violence.   The nature and circumstances of Gregory Purdy's offenses were of the utmost seriousness, and fully support the Government's recommended sentence of 63 months' imprisonment.

### B. The History and Characteristics of the Defendant

Despite the multiple assaults that Purdy committed on January 6, he has no criminal history, including no documented history of violence.   Additionally, the defendant is a former contractor with a property management company.   PSR ¶ 124.   He completed some college classes and has multiple Home Improvement Contracting licenses.   PSR ¶¶ 119-120, 122.   The defendant reported four business holdings, two of which are real estate businesses and two of which are construction businesses.   PSR ¶ 132.   However, the defendant has not provided financial information as requested by the Probation Office.   PSR ¶¶ 130, 137, 138.   Finally, the defendant is currently in custody, and the PSR indicates that there are no physical, mental, emotional, or substance abuse issues that would prevent the defendant from serving a term of incarceration.[7]

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Purdy's criminal conduct on January 6 was the epitome of disrespect for the law. As noted in a recent case in this district, Judge Jackson stated, "We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was

_____

[7]

was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power." *United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20.

### D.    The Need for the Sentence to Afford Adequate Deterrence

#### General Deterrence

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[8] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### Specific Deterrence

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

First, although the defendant has a criminal history category of I, his actions on January 6 show his willingness to commit violence against law enforcement. *See* Section II.B. *supra.* Second, the defendant has shown no remorse or contrition for his acts, and his statements to police and on social media downplay the seriousness of his actions.   He repeatedly characterized his assaults on officers as "peaceful pushes" that were justified in light of his disputes with the election results. Trial Ex. 426.1, 427.1 and Image 15.   Regarding the certification of the election, Purdy proclaimed he was marching to Congress and he was "not going to leave until we demand the right thing be done today."   Trial Ex. 411.1.   Third, beyond downplaying the seriousness of his

---

[8] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

conduct, Purdy celebrated his actions that day and advocated for political violence.   He claimed it was his "job to uphold the Constitution and do a fucking rebellion" and "[i]f our democracy is still not respected after today we might need to go 1776 on their ass because that's our duty." Trial Exs. 428.1, 440.1.

Finally, Purdy did not commit just one violent act, or have just one bad moment on January 6, he committed a *series* of criminal and violent acts that day: by the Lower West Plaza, Purdy lowered his shoulder and pushed into MPD Officer A.G., knocking him off the police line; there he also pushed MPD Officer B.B.; Purdy then went to the top of the Northwest stairs and grabbed a barricade in front of a line of officers and pushed the barricade over towards U.S. Capitol Police Officer B.T., interfering with officers' ability to hold the line; then, after leaving the Capitol Building the second time, Purdy threatened officers on the Upper West Terrace, (asking "Are you guys going to let us in, or are we gonna have to push in?"); he then attempted to coordinate other rioters into a big push against those officers (waving other rioters to move forward towards the officers, yelling "Guys, guys, we all gotta go at once…", and counting down from ten to one with his hands raised for the crowd); and finally, Purdy ran up stairs and rammed into MPD Officer C.K. and successfully pushed him back off of the police line, and then grabbed the officer's baton, only stopping when other officers physically restrained him.   Purdy engaged in multiple attacks against officers in different locations and at different times – his attack of Officer C.K. was over an hour after his attacks of Officers A.G., B.B., and B.T.   Purdy had the time and multiple opportunities to turn around and avoid violence but in fact deliberately sought it out, suggesting he needs significant deterrence to prevent him from engaging in such behavior again in the future. Therefore, this defendant's sentence must be sufficient to provide specific deterrence from

committing future crimes of violence, particularly in light of his complete lack of remorse about his actions and the sheer volume of attacks against police he committed that day.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[9] "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

---

[9] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[10] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Oliveras*, 1:21-CR-738 (BAH), defendant Michael Oliveras was convicted by a jury of three felony counts, including Civil Disorder (18 U.S.C. § 231(a)(3)) and Assaulting, Resisting, or Impeding Certain Officers (18 U.S.C. § 111(a)(1)) and Obstruction of an Official Proceeding (18 U.S.C. § 1512(c)(2)), and four misdemeanor counts. After the Supreme Court's decision in *Fischer*, the Government voluntarily moved to dismiss the Section 1512(c)(2) conviction, similar to Purdy's case here. Additionally, similar to Purdy, Oliveras started the day on the sidewalk near the Lower West Plaza, where he joined rioters swarming police officers and pushed officers (although Oliveras was part of a group push and not directly pushing officers at this time); Oliveras yelled threats and harassing statements at officers (such as "Fucking Oathbreakers!"); Oliveras also entered the Capitol Building through the Senate Wing Doors; he entered the Capitol Building twice (he first entered at 2:22 p.m. for approximately 16 minutes, and a second time at 2:50 p.m.); after leaving the Capitol Building, Oliveras also assaulted officers (he stood at the front of a line of rioters on the Upper Northwest courtyard, and at one point stepped forward and directly pushed into officers); and Oliveras showed a lack of remorse (saying to FBI

---

[10] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

agents, "I wouldn't change a thing, I'd do it again."). Purdy directly assaulted at least three officers – pushing officers A.G. and B.B. on the sidewalk on the west side of the Capitol and running into officer C.K. on the Upper West Terrace.   Additionally, Purdy pushed over a barricade the officer B.T. had been holding at the top of the Northwest Stairs, which allowed other rioters to gain access to the Upper West Terrace.

Judge Howell properly took into consideration Oliveras' intent to stop the certification of the 2020 presidential election and the unique nature of the January 6 riot (*see* Sentencing Ex. B, *United States v. Oliveras*, 21-cr-738 (BAH), Sentencing Tr. at pp. 46-50), and gave an upward departure pursuant to U.S.S.G. § 5K2.7 (and alternatively, varied) "as a result of the significant disruption of a governmental function caused by the defendant's criminal conduct." *Id*. at p. 97. Judge Howell ultimately sentenced Oliveras to 60 months' imprisonment, with a calculated Guidelines range of 37-46 months' imprisonment. Also, Judge Howell specifically noted that Oliveras' conduct would have been "more egregious" had Oliveras "participate[d] in more direct violence against officers," as Purdy did here.   *Id*. at p. 96.   Moreover, Purdy's guidelines accurately reflect the sheer volume of his criminal actions.   Accordingly, a higher sentence for Purdy is appropriate here.

In *United States v. Salvador Sandoval*, 1:21-cr-195 (CKK), the Court held a bench trial and the defendant was convicted on multiple counts, including one count of 18 U.S.C. § 231(a)(3), four counts of 18 U.S.C. § 111(a)(1), one count of 18 U.S.C. § 1512(c)(2), and six misdemeanors. Similar to Purdy, Sandoval was part of a major breach of the Capitol Building (Sandoval was at the front of the mob that breached the East Rotunda Doors); entered the Capitol Building; committed multiple assaults against officers (including grabbing Officer M.L.'s riot shield and

passing it back to the mob to be used against the police; assaulting Officer E.C. twice, including charging forward and blindsiding Officer E.C., almost knocking him to the ground; engaging in a tug of war with Officer J.M. over the officer's shield; pushing MPD Officer K.G.); was found beyond a reasonable doubt to have been acting to stop the certification of the 2020 presidential election; remained on restricted Capitol grounds for over an hour after exiting the building (Sandoval exited at 3:30 p.m., and did not leave until around 5:42 p.m.); and showed no remorse for his actions (after January 6, Sandoval said, "Sad that a girl was killed and people were hurt but otherwise it was amazing.").   Distinct from Purdy, however, Sandoval's fighting with officers took place insider of the Capitol Building (likely in closer proximity to lawmakers and staff), and when Sandoval heard of the arrests of other rioters, he seemingly prepared to run, packing a backpack full of food, buying an untraceable telephone, and possessing an AR-15 style rifle with several loaded clips ready, all of which were recovered at this residence.   Judge Kollar-Kotelly sentenced Sandoval to 88 months' imprisonment.   Here, because Purdy's assaults of officers took place outside of the Capitol Building and there is no evidence that Purdy attempted to run when he discovered the investigation/charges, a shorter sentence is appropriate.

In *United States v. Daniel Scott*, 21-CR-292 (RCL), defendant Daniel Scott entered the Capitol grounds in the first wave of rioters to the west plaza, with fellow Proud Boy members. Early on January 6, Scott encouraged his fellow Proud Boy members to "take the fucking Capitol" while they gathered on the Capitol's east plaza at 11:45 a.m.   At the Northwest staircase, Scott bulldozed two U.S. Capitol Police officers backward and up a set of steps.   The hole created by Scott's advance collapsed that part of the line.   The rioters behind Scott rushed up the stairs and were the first to enter the building some 20 minutes later through the Senate Wing Door.   Both

Scott and Purdy were important to the breach of the Senate Wing Doors and both tried to organize and encourage the crowd. This court sentenced Scott to 60 months' imprisonment. However, Gregory Purdy committed more assaults than Scott, and Purdy went to trial and did not accept responsibility, so understandably Purdy would merit a slightly higher sentence.

## VII.    RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. §3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Because Purdy was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two

statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both the VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the Government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[11]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the

---

[11] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."); *cf.* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

More specifically, the Court should require Purdy to pay $2,000 in restitution for his convictions on Counts One, Two, Three, Four, Five, Eight, Nine, and Ten. This amount fairly reflects Purdy's role in the offense and the damages resulting from his conduct. Moreover, in felony cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   FINE

The defendant's convictions for violations of 18 U.S.C. §§ 111(a)(1) and 231(a)(3) (Counts 1, 2, 3, 4, and 5) subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b). The defendant's convictions for violations of 18 U.S.C. § 1752(a)(1), (2), and (4) (Counts 8, 9,

44

and 10) subject him to a maximum fine of $100,000.   The defendant's convictions for violations of 40 U.S.C. § 5104(e)(2)(D), (F), and (G) (Counts 11, 12, and 13) subject him to a maximum fine of $5,000.   *Id.*   In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, the defendant has not shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e).

## IX.    CONCLUSION

For the reasons set forth above, the Government recommends that the Court impose a sentence on Gregory Purdy of 63 months' imprisonment, a three-year term of supervised release, $2,000 restitution, and mandatory assessments of $100 per felony, $25 per Class A misdemeanor, and $10 per Class B misdemeanor.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:    /s/ Lynnett M. Wagner
LYNNETT M. WAGNER
Nebraska Bar No. 21606
Assistant United States Attorney
601 D Street, N.W.
Washington, D.C. 20530
Tel: (402) 661-3700
Email: lynnett.m.wagner@usdoj.gov

/s/ Kyle M. McWaters
KYLE M. MCWATERS
Assistant United States Attorney
DC Bar No. 241625
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W.
Washington, D.C.20579
Phone: (202) 252-6983
Email: Kyle.McWaters@usdoj.gov